**\*E-FILED 6/23/08\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

GREGORY NEAL GRIMES,                           NO. C 05-01824 RS

    Plaintiff,                                        **ORDER AND OPINION**

  v.

UNITED PARCEL SERVICE, INC.,

    Defendant.
_____/

## I. INTRODUCTION

Plaintiff Gregory Grimes was terminated from his employment with defendant United Parcel Service, Inc. ("UPS") after a lengthy period of time during which he was off work on disability leave. After partial summary judgment was granted against Grimes on many of his claims, the matter proceeded to a jury trial on two claims: (1) UPS's alleged failure to engage in the "interactive process," and; (2) UPS's alleged failure to make a "reasonable accommodation." The jury returned a verdict in favor of UPS on both claims for relief.

What remains are certain equitable claims that, as the parties acknowledge, are to be decided by the Court. The parties submitted post-trial briefing and proposed findings of fact and conclusions

1

of law[1] before returning to present closing arguments on June 9, 2008.

After carefully considering the sufficiency, weight, and credibility of the testimony of the witnesses, their demeanor on the stand, the documentary evidence admitted at trial, and the post-trial submissions of the parties, the Court finds and concludes that (1) Grimes timely filed an administrative claim, (2) Grimes would not be entitled to equitable tolling were that claim not otherwise timely, and (3) Grimes failed to prove his claim under California Business and Professions Code sections 17200, *et seq.* This Opinion and Order comprises the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).

## II. DISCUSSION

### A. Timeliness of Grimes's Administrative Complaint

UPS contends that Grimes's claims in this action are barred by his failure to file a complaint with the California Department of Fair Employment and Housing ("DFEH") within one year of his termination by UPS.[2] Grimes argues that his DFEH complaint *was* timely filed when measured from the proper date, and that even if it were not so, he is entitled to the benefit of equitable tolling.

#### 1. The applicable deadline

UPS advised Grimes that he was terminated by a letter dated February 5, 2002. TX 35. The letter stated that the termination was "effective" as of February 3, 2002. *Id.* According to UPS records, the letter was delivered to Grimes's residence (by UPS) on February 7, 2002.

The letter apparently rested, unopened, at Grimes's front door until February 12, 2002. Grimes testified that during that time period, he typically entered and exited the home through the garage. That testimony was plausible and credible. Grimes represented to the DFEH that he did not actually receive the letter until February 18, 2002. At trial, he testified that he had mistakenly

---

[1] Although this opinion differs both in form and substance from either parties' proposed findings and conclusions, those submissions were nonetheless helpful to the Court for purposes of tracking and understanding the evidence and the parties' respective contentions.

[2] The record is not clear as to whether UPS contends that Grimes's claim under California Business and Professions Code sections 17200 *et seq.* would be subject to administrative exhaustion or not. In view of the other conclusions reached herein, the Court need not decide that question.

asserted that date based on review of a calendar entry showing that his then-estranged girlfriend, Beth Bayer, gave him some mail that day. Again, that testimony was plausible and credible.

Ultimately, however, it is simply of no legal import when Grimes actually first saw the letter. His DFEH complaint was filed on February 7, 2003–one year from the earliest date that the letter arrived at Grimes's residence. Unless the applicable limitation period began to run *before* the termination letter reached Grimes's house, his DFEH complaint was timely.

UPS contends that the limitation period *did* begin to run as early as the purported "effective date" of the termination (February 3rd), but certainly no later than when the termination letter was dated (February 5th). UPS relies on *Romano v. Rockwell Int'l*, 14 Cal.4th 479 (1996) for the proposition that the applicable limitations period begins to run when the adverse employment action actually *occurs*, rather than when the employee has *notice* of it. *Romano*, however, involved facts diametrically converse to those presented here. The *Romano* plaintiff had notice that his employer intended to terminate him long *before* the termination actually took place. The California Supreme Court rejected the argument that the limitations period began to run when plaintiff first had notice, reasoning that he had no reason to seek relief until he was actually terminated *See* 14 Cal.4th at 495 (noting that employee should not have to seek "a remedy for a harm that had not yet occurred.") Thus, the effect of the *Romano* decision was to *extend* the date on which the limitation period began to run from the time the plaintiff first had "notice" until the time the adverse employment action actually occurred.

Here, UPS would have the Court do the opposite: *compress* the time within which Grimes could file an administrative claim from when he actually received notice to the date UPS contends the termination was "effective."[3] Again, however, the Court need not decide when Grimes had actual notice of UPS's decision to terminate. Fully accepting UPS's contention that, under *Romano,* the relevant date is when the adverse employment action takes place, rather than when the employee has "notice," UPS has still failed to show as a matter of fact or of law that Grimes's DFEH

---

[3] Doing so would be contrary to the *Romano* court's admonition that "the limitations period set out in the FEHA should be interpreted so as to promote the resolution of potentially meritorious claims on the merits" 14 Cal.4th at 494.

3

complaint was untimely.[4]

An employer's undisclosed intention to terminate an employee simply cannot be an "adverse employment action" that would trigger running of the limitations period for the employee to file an administrative challenge to that decision. In most cases, where an employee is still appearing for work, this will never be an issue, because the employer can immediately advise the employee of the termination or other adverse decision. Where, as here, the employee is *not* coming to the workplace, it may be that an employer can do no more than send a letter to the employee's last known address. There could be cases, perhaps, where an employee could argue that such notice was not reasonable under the circumstances, or that for some other reason he or she should not be held to the date that the letter arrived on the doorstep. Conversely, there might be cases where an employer could argue that the limitations period began to run when the employer *attempted* to give notice, even though the employee did not receive actual notice until some later date. This case, however, presents no such complications. There is no dispute that UPS's termination letter arrived at Grimes's house on February 7, 2003, and that he filed his DFEH complaint one year later. UPS's contentions that Grimes was actually terminated as of the "effective date" stated in the letter, or as of the date shown on the letter, are not persuasive. For purposes of triggering the limitations period to file a DFEH complaint, Grimes was terminated no earlier than the day that he reasonably could have been expected to receive notification of his termination–i.e., February 7, 2002. Accordingly, Grimes is not barred from pursuing the claims he makes in this action by any failure to file a timely administrative complaint.

          2. Equitable tolling

In view of the Court's conclusion that Grimes's DFEH complaint was timely filed, his alternative arguments that equitable tolling should be applied would appear to be no longer of much import. Perhaps in recognition that the Court's legal conclusions set out above are subject to appellate review, however, UPS urges the Court to reach the equitable tolling issues. The Court concludes that the matter having been fully tried and briefed, it is appropriate to reach the question.

---

[4] There is no apparent dispute that the timeliness, or lack thereof, of Grimes's DFEH complaint is an affirmative defense as to which UPS bears the burden of persuasion.

4

Accordingly, the Court finds and concludes that Grimes failed to meet his burden to show that he is entitled to the benefit of equitable tolling.

The Court is not persuaded by Grimes's testimony that he was advised by any DFEH employee that he need not appear for his December 19, 2002 appointment or that his deadline was instead February 7, 2003. As reflected above, the Court concludes that February 7, 2003 was in fact Grimes's deadline, but the evidence does not support the conclusion that Grimes was ever so advised by the DFEH. Rather, the Court concludes that the preponderance of the evidence shows that Grimes had a December 19, 2002 appointment with the DFEH, that he chose not to, or otherwise failed, to attend. Even assuming any DFEH employee ever suggested that Grimes had until February 7, 2003, or later to file an administrative complaint, the Court finds and concludes that any such advice was precipitated by Grimes's inaccurate description of the facts, and that therefore no basis for equitable tolling exists.

B. Section 17200

Grimes assert that UPS has violated California Business and Professions Code sections 17200, *et seq.* by applying a "100% healed" policy to disabled employees seeking to return to work. Grimes contends that UPS effectively refused to let employees return to work unless they no longer had any restrictions as to what they could physically accomplish. There is no dispute between the parties that any such "100% healed" policy, if it existed, would violate the law. Rather, UPS argues that Grimes has failed to prove by a preponderance of the evidence that: (1) any such policy ever existed, or; (2) that he was adversely affected by any such policy.

1. Existence of policy

The evidence at trial suggested that at least some UPS employees or some of the employees of its agent-- the disability benefits administrator-- or both, may have believed that an employee could not be return to work until he or she was "100% recovered." Evidence tending to support a conclusion that at least a *de facto* policy may have existed at times included all of the following:

• During Grime's first leave of absence, Roxanne Merino, UPS's Regional Occupational Health Manager for Grimes's region, sent him a form letter then used by UPS stating: "Please note

5

1  the following: . . .Present a written full duty release from your doctor prior to returning to work."

2  • Shirley Heera was employed by Kemper, UPS's disability administrator beginning
3  January, 2002, as a case manager/claims examiner for UPS employees. Heera testified that on March
4  20, 2002, she and Gary Hollandsworth, UPS's Regional Workforce Planning Manager had a
5  telephone conversation during which they discussed that "because Mr. Grimes still wasn't 100
6  percent recovered, he didn't really qualify to return to work because UPS had this requirement that
7  he had to be 100 percent recovered."

8  • Grimes also testified that after he returned from his first disability leave, his manager, Bill
9  Klussman, told him that "had [Klussman] known that [Grimes] was not 100%, he wouldn't have
10 brought [Grimes] back."

11 Conversely, however, UPS introduced substantial, credible evidence that it did not have a
12 100% healed policy at any time relevant to this action, the "unfortunate" language in the Merino
13 letter notwithstanding.  Merino herself testified that she regularly spoke with employees about
14 possible accommodations.  Whatever Klussman may have thought or said about Grimes returning to
15 work at less than 100%, the uncontroverted evidence was that he worked with Grimes to make
16 scheduling accommodations to facilitate his ongoing medical treatment.  Additionally, UPS
17 introduced training manuals and other documents plainly evidencing that UPS's *official* policy was
18 to engage in the interactive process and to make reasonable accommodations in compliance with the
19 law.

20 In the final analysis, considering all of the conflicting evidence and weighing all of the
21 credibility issues, this question presents a close call.  The Court finds and concludes, however, that
22 Grimes failed to prove the existence at UPS of even a *de facto* "100% policy" during the relevant
23 time period by a preponderance of the evidence.[5]

24     2. Application of any such policy

25 Even assuming Grimes had been able to establish the existence of a 100% healed policy

---

[5] At the hearing, Grimes suggested that perhaps some more amorphous standard of "fairness" could be applied in lieu of a preponderance standard.  The mere fact that this claim sounds in equity creates no apparent basis for abandoning the standards by which matters of fact must be established.

6

applied by UPS to any of its employees, he failed to prove by a preponderance of the evidence that such a policy was ever applied to him, or that it had any effect on his termination from UPS employment.[6] The evidence conclusively established that at the point in time Grimes was terminated no information from any professional, medical or otherwise, had been generated yet alone received by UPS reflecting that he could work in any capacity, without regard to whether "accommodations" were offered or made.   There is simply no evidence that Grimes attempted to return to work prior to his termination requesting restrictions or accommodations, only to be denied permission to return because he was not 100% healed.

It is true that there was evidence that Grimes would have been able to return to work, with reasonable accommodations, not long after his termination date.  That evidence, however, does not support a conclusion that Grimes was impacted by the alleged 100% hired policy.  Indeed, the question of whether or not  UPS should have *sua sponte* offered him a short extension of his disability leave was part of the failure to accommodate and failure to engage in the interactive process claims that were tried to, and rejected by the jury.[7]

UPS terminated Grimes because the maximum period of his disability leave expired.  UPS did not apply a "100% healed" policy to Grimes.   As such, even assuming some employees or agents of UPS believed such a rule existed, Grimes's claim fails.

### III. CONCLUSION

For the reasons set forth above, (1) Grimes's administrative claim was timely filed, (2) had that claim been untimely, equitable tolling would not apply to resurrect it, and (3) Grimes failed to prove his claim under California Business and Professions Code sections 17200, *et seq.*   Within five

---

[6] Grimes argues that the alleged policy inhibited his ability to be rehired.  Even were such a contention viable under the section 17200 claim (notwithstanding the prior ruling on partial summary judgment rejecting the failure-to-rehire claim), those arguments are not borne out by the facts presented.

[7] UPS's contention, however, that the jury's verdict in and of itself precludes the Court from finding in Grimes's favor on the section 17200 claim is not persuasive.  As Grimes points out, the jury was given no instructions regarding a "100% healed" policy and was not asked to decide the question.

7

days of the date of this order, UPS shall submit a proposed judgment, after seeking plaintiff's approval as to form.

IT IS SO ORDERED.

Dated: 6/23/08

_____
RICHARD SEEBORG
United States Magistrate Judge